# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School District of Upper Dublin          :
                                         :
          v.                             :          No. 1520 C.D. 2019
                                         :          Argued:  June 7, 2021
Montgomery County Board of               :
Assessment Appeals, Montgomery           :
County, Upper Dublin Township,           :
School District of Upper Dublin          :
                                         :
Appeal of: General Auto Outlet           :


BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge
           HONORABLE J. ANDREW CROMPTON, Judge (P.)
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CROMPTON                         FILED:  July 16, 2021


          Before this Court is the appeal of General Auto Outlet (Owner) of the
September 16, 2019 order of the Montgomery County Court of Common Pleas (trial
court) denying its Motion to Dismiss Tax Appeal and the October 1, 2019 final order
of the trial court establishing the value of Owner's property (Subject Property) for
tax years 2018 through 2020.[1]

---

[1] The School District of Upper Dublin (School District) contends that this Court does not
have jurisdiction over the appeal of the trial court's September 16, 2019 order because Owner
stated it was appealing the order entered on October 1, 2019.  However, an appeal of a final order
permits a challenge to any interlocutory order, and the interlocutory order does not need to be
identified in the Notice of Appeal.  *See* 20 Pa. Appellate Practice, §341:3.1 (2020-2021).

# I.  Background and Procedural History

The present matter initially came before the trial court from the School District of Upper Dublin's (School District) reverse appeal from a decision of the Montgomery County Board of Assessment Appeals (Board) in regard to the tax assessment of the Subject Property.  The Subject Property is a shopping center consisting of 9.7 acres of land and 90,691 square feet of retail space in 2 buildings located at 3610 Welsh Road in Upper Dublin Township (Township) in Montgomery County, Pennsylvania.  The principal shopping center building totals 88,087 square feet and is leased to multiple retail tenants of varying sizes.  Ashley Furniture is the largest tenant, leasing approximately 40% of the total leasable space.  This space was previously leased to a supermarket and a drug store.  The remainder of the shopping center is leased to 11 small- and mid-sized retail tenants including restaurants and stores that sell clothing, shoes, mattresses, *etc*.  PNC Bank maintains a branch in a separate freestanding building totaling 2,604 square feet.

On July 29, 2013, the School District appealed to the Board to challenge the $4,905,860 assessment of the Subject Property.  On September 26, 2013, a hearing was held before the Board, and on October 30, 2013, the Board determined that the assessment was proper.

On November 25, 2013, the School District filed an appeal with the trial court, and both Owner and the Township filed Notices of Intervention as of right in the matter.  In June 2017, the parties agreed to a settlement, but on July 5, 2017, our Supreme Court issued its opinion in *Valley Forge Towers Apartments N, LP v. Upper Merion Area School District*, 163 A.3d 962 (Pa. 2017).[2]

_____

[2] In *Valley Forge*, our Supreme Court held that taxpayers could invoke the equity jurisdiction of a court of common pleas to seek declaratory and injunctive relief based on the theory **(Footnote continued on next page…)**

On July 18, 2017, Owner filed a petition to declare the settlement null and void and to dismiss the School District's appeal based on the *Valley Forge* decision. On August 7, 2017, the School District filed a motion to enforce the settlement agreement. After a hearing, the trial court issued an order, on November 9, 2017, granting Owner's petition to the extent it sought a declaration that the settlement agreement was null and void. On that same date, the trial court filed a separate order deferring the issue of whether the School District's appeal should be dismissed based on *Valley Forge*. The parties agreed to an interim resolution of the *Valley Forge* issue, which was addressed in a trial court order dated February 15, 2018. This order provided that the School District's appeal for tax years 2011 through 2017, and Owner's petition to dismiss the appeal, were both withdrawn. In addition, the order provided that Owner preserved its argument that the appeal for tax year 2018 should be dismissed based on the *Valley Forge* decision and that the issue could be raised any time prior to, or at, trial for tax year 2018. The order further provided that the parties would exchange certain documentation. Supplemental Reproduced Record (S.R.R.) at 9b-10b.

On July 11, 2019, Owner filed a motion to dismiss, renewing its argument that the appeal should be dismissed, per *Valley Forge*. At a July 12, 2019 pretrial conference, the trial court stated that the *Valley Forge* issue would be heard during trial and would be determined as part of the trial court's ruling on the overall appeal. Thus, when the trial commenced on September 16, 2019, the trial court issued an order denying Owner's motion to dismiss without prejudice.

---

that the school district violated the Uniformity Clause of the Pennsylvania Constitution, Pa. Const. art. 8, §1, and that the Uniformity Clause did not permit the school district to selectively appeal assessments of commercial properties while choosing not to appeal assessments of other types of properties, such as single-family residential homes.

On September 16, 2019, the trial court heard all the evidence from both parties on the *Valley Forge* issue. The parties also presented evidence on the value of the Subject Property. On October 1, 2019, the trial court issued a Memorandum and Order, setting forth findings of fact and conclusions of law and determining the assessed values for the Subject Property for 2018 through 2020. Owner filed a timely Notice of Appeal to this Court on October 18, 2019, and a Concise Statement of Errors Complained of on Appeal on November 1, 2019. Accordingly, the trial court issued an opinion in support of its Memorandum and Order on December 17, 2019.

## II.    The Trial Court's Opinion

In its opinion, the trial court stated that, on July 17, 2017, less than two weeks after our Supreme Court filed its *Valley Forge* opinion, the School District adopted a procedure for assessment appeals. Per this procedure, the School District would identify and file assessment appeals on industrial, commercial, and residential properties in instances where the appeal would provide a reasonable expectation of an increase in taxes of at least $10,000 annually. The trial court noted that, at the time of trial, the School District had filed a total of eight tax assessment appeals for tax years 2017 and 2018, and of the eight properties at issue, six were classified commercial, one was classified as an apartment, and one was classified as residential, although the residential property encompassed multiple buildings, including eight leased apartment units. Trial Ct. Op., 12/17/19, at 3. Thus, the School District had not filed any tax assessment appeals on residential properties that were wholly occupied by the property owner.

After reviewing the evidence, the trial court determined Owner failed to demonstrate that the School District's appeal of the Subject Property tax

4

assessments, for 2018 through 2020, violated our Supreme Court's holding in *Valley Forge*. The trial court reasoned that the *Valley Forge* Court had expressly opined that its holding did not apply to the use of a neutrally applied "monetary threshold" in selecting properties to be appealed, as was utilized by the School District here. Trial Ct. Op., 12/17/19, at 5 (quoting *Valley Forge*, 163 A.3d at 979). Further, the trial court found no evidence that the School District had implemented the monetary threshold in any sort of discriminatory manner. Trial Ct. Op., 12/17/19, at 26.

In regard to valuation of the Subject Property, the trial court determined:

> The appraisers agreed that the [Subject] Property was substantially undervalued under its then-current assessment, but they disagreed on the extent of the undervaluation. Michael J. Barth of the Michael J. Barth Company, called by Owner, testified to the following values for the tax years at issue:
>
> 2018: $13,570,000
> 2019: $13,900,000
> 2020: $13,900,000
>
> Joseph Vizza of Philadelphia Suburban Realty Appraisal Group, testifying for the [School] District, concluded that the [Subject] Property had the following values:
>
> 2018: $19,250,000
> 2019: $20,200,000
> 2020: $20,150,000
>
> Despite their differing conclusions, there was much common ground between the two appraisers . . . . For most of 2018, one of the tenant spaces was vacant, but a new lease for that space was entered in late 2018 or early 2019, resulting in a fully leased shopping center. That vacancy rate at the shopping center has never exceeded 5%. All leases at the [Subject] Property are triple net, *i.e.*, they require tenants to reimburse Owner for their pro rata share of all expenses, including real estate taxes . . . .

5

Significantly, there was also broad agreement between the two appraisers on the proper methodology for valuing the [Subject] Property, although with limited but critical differences between them. The appraisers agreed that the best method of valuation for the [Subject] Property was the income capitalization approach. They agreed that the replacement cost approach was not applicable to the [Subject] Property.

The appraisers also agreed that the income capitalization approach involved the following seven steps:

(a) determining the potential gross rental revenue from tenants;
(b) determining a percentage factor for vacancy/collection loss and reducing the gross rental revenue by that factor;
(c) adding the total expense reimbursement revenue from tenants, other than property tax reimbursement;
(d) subtracting the actual operating expenses, other than property tax expense, resulting in the net operating income for the [Subject] Property;
(e) determining a capitalization rate;
(f) adjusting the capitalization rate by adding a tax load factor; and
(g) dividing the net operating income by the adjusted capitalization rate.

Despite their agreement on this methodology, the appraisers differed on how each of these factors should be calculated. Each factor was thus addressed separately by the [trial court].

Trial Ct. Op., 12/17/19, at 5-7.

In regard to gross rental revenue, the trial court stated that the School District's appraiser calculated potential gross rental revenue for each year based on market rental rates, whereas Owner's appraiser calculated this amount using actual rents under the leases. The trial court could not reconcile the different figures, and since the School District had the burden of proof, the trial court accepted the gross rental amounts utilized by Owner's appraiser, *i.e.*, $1,644,702 for 2018, $1,669,702 for 2019, and $1,665,966 for 2020.

As for vacancy/collection loss, the School District's appraiser used a factor of 6%, and Owner's appraiser used a factor of 7.5%. The trial court adopted

6

the factor used by Owner's appraiser, in light of the "likely impact that a substantial increase in taxes, retroactive to 2018, [would] have on the tenants." Trial Ct. Op., 12/17/19, at 8.

The trial court addressed the expense reimbursement and operating expense factors together, noting they are "interrelated." Trial Ct. Op., 12/17/19, at 8. The trial court found that the appraisers' calculations differed in two substantial respects. The School District's appraiser included an administrative charge of 15% in reimbursement income for common area maintenance expenses. Owner's appraiser excluded the 15% charge from reimbursement income because he also excluded corresponding administrative expenses, resulting in a "wash." Trial Ct. Op., 12/17/19, at 9. However, the trial court noted that Owner's appraiser included administrative expenses in his calculation of operating expenses. Thus, the trial court found that the appraiser for the School District more accurately reflected the reimbursement income and operating expenses because his calculation "accurately accounted for the receipt of the 15% administrative fee payable by the tenants." *Id*.

The trial court noted that the appraisers also disagreed on operating expenses relative to a "reserve" figure. *Id*. The School District's appraiser calculated reserves at $0.15 per square foot. Owner's appraiser set the reserves at $0.45 through $0.47 per square foot, increasing one cent per year from 2018 through 2020. The trial court determined that neither figure was fully explained or justified by the appraisers, so the trial court adopted Owner's appraiser's calculations, again in light of the fact that the School District carried the burden of proof.

The trial court explained that the School District's appraiser determined a capitalization rate of 8% based on the theory that the market reflected a base capitalization rate of 7.75%, but that this rate should be increased by 0.25% to 8%,

7

to reflect the above-market rental for the space occupied by PNC Bank. Owner's appraiser determined a capitalization rate of 8.25% "based on a 'band of investment' approach considering both a mortgage constant and an equity dividend." Trial Ct. Op., 12/17/19, at 10. The trial court adopted the School District's appraiser's 8% rate, which it determined most accurately reflected the shopping center market.

The trial court further determined that the most significant difference between the appraisers was in the application of the tax load factor. The trial court acknowledged that the tax load factor calculation for each year begins by multiplying the State Tax Equalization Board ratio by the tax millage rate. The trial court noted that the appraisers used different millage rates but that the differences were not material. The trial court adopted the calculations of the base tax load factor of Owner's appraiser, rounded to the nearest one-hundredth of a percent, *i.e.*, 2.30% for 2018, 2.20% for 2019, and 2.17% for 2020, but added that the real disagreement was over the next step in the calculation process. Owner's appraiser's method was to add the entire tax load factor to the capitalization rate, yielding an adjusted capitalization rate in excess of 10%. The School District's appraiser's method was to multiply the base tax load factor by the vacancy/collection loss percentage and add only the smaller, adjusted tax load factor to the capitalization rate. By using a small percentage of the base tax load factor, the School District's appraiser would increase the capitalization rate by a mere fraction of one percentage point. Trial Ct. Op., 12/17/19, at 10-11.

Owner's appraiser testified that his approach was the generally accepted appraisal practice, that the tax load factor should apply for the entire property being assessed, not just the landlord's share of the taxes, and that he has never seen an appraisal that adjusted the tax load factor as the School District's

8

appraiser did in the instant matter. The trial court noted, however, that Owner's appraiser's testimony was impeached by a prior appraisal report he had prepared for the Subject Property, in which he had utilized the same method employed by the School District's appraiser here. Accordingly, the trial court found the School District's appraiser to be more persuasive, reasoning that the purpose of the income capitalization approach is to value the income stream of the Subject Property to an investor-purchaser, which would reflect only the portion of the taxes to be borne by the landlord, not the entire tax burden on the Subject Property.

With rounding, the trial court determined that under the income capitalization approach, the value of the Subject Property was $18,000,000 in 2018, $18,500,000 in 2019, and $18,500,000 in 2020.

The trial court recounted the testimony of Bruce Goodman, owner of Goodman Properties and the Subject Property.[3] Mr. Goodman testified to the decline of the rental market for brick-and-mortar operations due to demographic changes and the increased use of online shopping. He also testified that losing a supermarket at the shopping center had a negative impact on the value of the Subject Property. The trial court noted that it considered this testimony but that it relied more heavily on the quantitative analysis of the appraisers, who took all of this into account in their respective valuations of the Subject Property. The trial court also noted that Mr. Goodman testified that title to the Subject Property is encumbered by a mortgage, which includes a prepayment penalty that would need to be taken into account in conjunction with any sale of the Subject Property. Owner's appraiser testified that the prepayment penalty would reduce the amount that a hypothetical seller would be willing to accept for the Subject Property. However, the trial court

_____

[3] Owner states: "Goodman Properties is an affiliate of [Owner,] and Bruce Goodman is the principal owner of both entities." Owner's Br. at 41.

noted that, in his report, Owner's appraiser did not quantify what the reduction in value would be from any such penalty. The trial court expressed its skepticism that Owner's financing arrangements would affect the market value of the Subject Property, but ultimately determined it did not need to make a finding on the issue because Owner had failed to prove a quantifiable adjustment to the value of the Subject Property based on the prepayment penalty.

The trial court added that the parties agreed the proper assessments for the Subject Property are reached by multiplying the fair market value, as determined by the trial court, by the applicable ratio as stipulated by the parties.

The trial court further determined that, for tax year 2018 and thereafter, the School District had applied a monetary threshold consistent with our Supreme Court's decision in *Valley Forge*. Moreover, the trial court found no evidence that the School District had implemented its threshold in a discriminatory manner. Thus, there was no violation of the Uniformity Clause of the Pennsylvania Constitution.

As to valuation, the trial court stated that it weighed all the evidence and expressed, in its October 1, 2019 Findings of Fact and Conclusions of Law, as well as in its subsequent December 17, 2019 opinion, the reasons for adopting the opinion of one appraiser over the other. As for the proper tax load factor to be applied, the trial court stated that it used the methodology testified to by the School District's appraiser, whom the trial court found to be more credible. The trial court added that it based its determination of the current market value of the Subject Property on competent, credible, and relevant evidence and, after considering the methodologies and data presented by the expert witnesses and applying the proper formula, ultimately determined the proper assessments for the three years in question

were $9,738,000 for 2018, $10,156,500 for 2019, and $9,120,500 for 2020. Owner now appeals the trial court's orders to this Court.[4]

### III. Arguments

### A. Owner's Arguments

Owner argues that the trial court's determination to defer its motion to dismiss until trial, rather than to address it separate and apart from the valuation trial, deprived it of an opportunity to engage in meaningful discovery and put it at a disadvantage, improperly placing the burden of proof on Owner, rather than on the School District. Owner contends that the School District did not have a codified written appeals policy until after our Supreme Court filed its decision in *Valley Forge*, and that the School District initiated the present appeal years before its adoption of its policy on appeals. Further, Owner maintains that the School District's policy of appealing only properties underassessed by $600,000,[5] was arbitrary and discriminatory as it essentially eliminated all residential properties

---

[4] This Court's review in a tax assessment appeal is limited to a determination of whether the trial court abused its discretion or committed an error of law, or whether the decision is supported by substantial evidence. *Willow Valley Manor, Inc. v. Lancaster Cnty. Bd. of Assessment Appeals*, 810 A.2d 720 (Pa. Cmwlth. 2002). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Norwegian Twp. v. Schuylkill Cnty. Bd. of Assessment Appeals*, 74 A.3d 1124, 1128 n.3 (Pa. Cmwlth. 2013) (internal citation omitted). In regard to the trial court's dismissal of the matters raised as part of Owner's motion to dismiss, this Court's standard of review also includes an analysis of whether Owner's constitutional rights were violated. *See Macy's, Inc. v. Bd. of Prop. Assessment, Appeals, Rev. of Allegheny Cnty.*, 61 A.3d 361 (Pa. Cmwlth. 2013); *Ray v. Brookville Area Sch. Dist.*, 19 A.3d 29, 31 n.3 (Pa. Cmwlth. 2011).

[5] Owner relies on the testimony of the School District's former business manager to contend that the threshold of a $10,000 increase in tax assessment could only be reached if a property had increased in fair market value by $600,000 or more. The former business manager also acknowledged during questioning by Owner's counsel that "very few, if any, residential properties would make that cut." Owner's Br. at 28 (citing Reproduced Record (R.R.) at 157a-58a).

11

from consideration for appeal. Owner's Br. at 15-16, 23. Owner further maintains that the School District did not file any assessment appeals in regard to single-family residential properties and focused its efforts only on commercial properties, noting that at the time of trial, the School District had filed eight tax assessment appeals for tax years 2017 and 2018 and that, of those eight, "six were classified as commercial, one was an apartment complex, and one was as an income-producing rental property." Owner's Br. at 23.

Owner argues that the trial court erred by finding the School District had not violated the Uniformity Clause of the Pennsylvania Constitution because the School District's selection process was not consistent with its own policy and was implemented in an "arbitrary and capricious" manner. Owner's Br. at 19. Owner asserts that the School District has historically appealed only assessments of retail and income-producing apartment properties, while not uniformly appealing residential properties, and that the School District's appeals have been focused on properties owned by those residing outside of the School District, which is unconstitutional. Owner argues: "It strains logic to conclude that [our] Supreme Court, when passing upon the merits of a monetary threshold, intended to sanction a formula designed and implemented to subject only commercial properties for appeal." Owner's Br. at 31.

As to valuation of the Subject Property, Owner acknowledges that each party's appraiser prepared documents reflecting the Subject Property was underassessed. However, each presented "dramatically different valuations." Owner's Br. at 32.

Owner contends that the trial court made valuation judgments that were not supported by the evidence and were made without articulating the reasons for

12

same. Specifically, Owner argues that the trial court engaged in a "pick and choose" approach, making arbitrary determinations as to which appraiser was more credible, and that the trial court's findings lacked clarity and specific credibility determinations. Owner's Br. at 36.

Owner also argues that the trial court erred "by ignoring [Mr.] Goodman's testimony." Owner's Br. at 41. Relative to this criticism of the trial court, Owner states: "The [trial court], making an independent judgment best left for an expert, found that while individual financing arrangements would affect market value, the effect must be monetarily quantified in order to have probative value." *Id.* (citing R.R. at 126a-27a).

Owner contends that the trial court also erred by adopting a partially loaded capitalization rate, arguing that the School District's appraiser and the trial court were unable to point to any specific authority that endorsed the School District's approach. "Rather, the support was more of a whimsical assumption that a landlord pays the taxes for vacant space. However, that assumption is not always true . . . . [T]he [trial court] surmises . . . if the [Subject] Property is leased (as opposed to owner occupied) and becomes vacant, [O]wner would have to pay the taxes." Owner's Br. at 42. Owner argues that "[t]he basic and controlling substantive issue in a real estate assessment appeal is the correctness of the total assessment of the property as a unit." Owner's Br. at 46. Owner further argues:

> Discounting the capitalization rate for vacancy produces an artificially low capitalization rate and the [trial court's] endorsement of such a practice[] was a manifest error of law. The [trial court] provided no specific reason to deviate from generally accepted valuation principles. Accordingly, the [trial court's] calculation of the loaded capitalization rate must be rejected, and [Owner's] loaded capitalization rate must be adopted.

13

*Id.*

In addition, Owner maintains that the trial court erred and abused its discretion by failing to consider the effect of higher taxes on vacancy. *Id.* Owner states that "[v]acancy and collection loss is defined as an allowance for reductions in potential gross income attributable to vacancies, tenant turnover, and nonpayment of rent." Owner's Br. at 47 (citing *The Appraisal of Real Estate* (12th ed. 2001)). Owner adds: "[l]ogically, if income is reduced by an allowance for vacancy and collection loss, then, under the income approach to value, taxes based on the adjusted income will also be reduced." *Id.* Citing *In re Johnstown Associates*, 431 A.2d 932, 935 (Pa. 1981), Owner asserts that our Supreme Court has endorsed the concept of considering higher taxes on vacancy and value. *Id.* Owner contends that, because the trial court did not provide any basis to deviate from generally accepted principles of valuation, its calculation of the loaded capitalization rate must be rejected, and Owner's loaded capitalization rate must be adopted. Owner's Br. at 48.

**B. The School District's Arguments**

The School District argues,[6] initially, that Owner's contention that the trial court erred by dismissing its motion to dismiss without a separate hearing and an opportunity to conduct discovery, as well as its contention that the trial court erred by applying valuation judgments without evidentiary support, are both waived because Owner failed to include either issue in its Concise Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b).

Further, as to Owner's motion to dismiss, the School District states that Owner filed two such motions; one in August 2017 and one in July 2019, and that the trial court had entered an agreed-upon order, in February 2018, acknowledging

---

[6] The Township of Upper Dublin, the Montgomery County Board of Assessment Appeals, and Montgomery County each join in the brief filed by the School District.

14

Owner was withdrawing its initial motion and that the School District was to provide certain information to Owner. The School District adds that this same order stated that Owner could renew its motion to dismiss regarding the 2018 tax year "at any time prior to or at trial." School District's Br. at 21. In addition, the School District contends that the trial court's February 2018 order gave any party the right to praecipe the case for trial and to address any discovery disputes, and that Owner never pursued discovery or followed the agreed-upon procedure for addressing discovery disputes. *Id*. at 21-22. Further, the School District states that Owner's counsel failed to object to "the manner in which the case was proceeding" at the September 16, 2019 trial. *Id*. at 22.

As to the matter of determining which properties are selected for tax assessment appeals, the School District notes that its former business manager testified that the School District identifies and files assessment appeals relative to industrial, commercial, and residential properties in instances in which an appeal "[will] provide a reasonable expectation of realizing an annual increase in taxes of $10,000 or more." School District's Br. at 28. This amount is determined based on a "break even" number for the costs the School District will likely incur in bringing the appeal. *Id*. Further, the School District contends that "Owner failed to introduce evidence of a single residential property which met the criteria of [the School District's] [p]rocedure[,] which was not appealed" or "any evidence establishing that the $10,000 threshold was so high that it completely eliminated any residential properties from ever being appealed." School District's Br. at 29. Further, the School District asserts that Owner argues that the School District is "engaging in 'selective appeals' [but never cites] any evidence to support such a conclusion." *Id*.

15

Additionally, the School District maintains that "the real fault in [] Owner's arguments is the assumption that unless assessment appeals of residential properties were taken during the years in question, the policy then must violate *Valley Forge*." School District's Br. at 30. "This assumption is contrary to this Court's holdings and not supported by any language" in *Valley Forge*. *Id*. "This [] argument is based on the premise that unless a policy results in appeals of an identical number of commercial and residential properties it should be presumed unlawful." School District's Br. at 32. The School District adds that Owner did not provide any evidence that its procedure was not applied in a uniform manner or that the School District declined to appeal any residential property assessment for which there was a reasonable expectation of realizing an annual tax increase of $10,000 or more. School District's Br. at 11. The School District notes that subsequent to the *Valley Forge* decision, this Court issued decisions approving "the use of financial thresholds and cost-benefit analysis to narrow the number of properties a school district evaluates for appeal." School District's Br. at 26-27 (citing *Kennett Consol. Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 228 A.3d 29, 37-39 (Pa. Cmwlth. 2020); *Bethlehem Area Sch. Dist. v. Bd. of Revenue Appeals of Northampton Cnty.*, 225 A.3d 212, 219-221 (Pa. Cmwlth. 2020); and *East Stroudsburg Area Sch. Dist. v. Meadow Lakes Plaza* (Pa. Cmwlth., No. 371 C.D. 2019, filed Oct. 17, 2019) 2019 WL 5250831. In fact, the School District emphasizes that, in *East Stroudsburg*, this Court noted:

Contrary to Taxpayers' argument, we find nothing in our Supreme Court's analysis in *Valley Forge* that precludes application of a reasonable monetary threshold for assessment appeals, based on an estimate of the minimum potential revenue gain that will make a tax assessment appeal cost-effective. Indeed, a taxing district's selection of a property for an assessment appeal that failed to take into account

16

whether the appeal was likely to be cost-effective might well be fiscally irresponsible.

School District's Br. at 27 *(*quoting *East Stroudsburg*, slip op. at 11, 2019 WL 5250831 at *5).

The School District argues that, to the extent Owner complains the appeal for tax years prior to 2018 were withdrawn but that the appeals for tax years 2018 and beyond were permitted to proceed to trial, the issue is waived because Owner agreed to this procedure and did not raise the issue before the trial court in its Statement of Errors Complained of on Appeal. School District's Br. at 32-33. Further, the School District asserts that "[i]n cases where an appeal is pending before a trial court . . . subsequent tax assessments are automatically appealed, have a separate status, and continue to exist notwithstanding dismissal of the original assessment appeal." School District's Br. at 33 (citing *525 Lancaster Ave Apts, L.P. v. Berks Cnty. Bd. of Assessment Appeals*, 111 A.3d 1231, 1235-36 (Pa. Cmwlth. 2015)).

In regard to valuation of the Subject Property, the School District argues that the trial court properly considered and reconciled the testimony of the competing experts on the matter in order to determine the fair market value of the Subject Property. Quoting *Cedarbrook Realty, Inc. v. Cheltenham Township*, 611 A.2d 335, 340 (Pa. Cmwlth. 1992), the School District notes "[t]hat this Court has 'acknowledged repeatedly that the valuation of property is not an exact science and that it is the fact[-]finder's role to determine the weight to be accorded an expert's testimony in this area.'" School District's Br. at 34. Further, the School District notes that "the testimony of an expert in an assessment appeal is to be evaluated in the same manner as any other expert witness . . . . Specifically, the fact-finder may accept all, none or part of an expert's testimony, part of one expert's testimony and

17

part of another's." School District's Br. at 35 (quoting *Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 730 A.2d 1017, 1021 (Pa. Cmwlth. 1999)).

The School District discounts Owner's reliance on a manual for appraisers, which was not part of the record in the case, to refute Owner's contention that the trial court's decisions on the tax load factor and capitalization rate were not supported by substantial evidence. School District's Br. at 36. The School District asserts that the trial court listened to each appraiser and determined that the approach used by its appraiser in determining the tax loaded capitalization rate was more persuasive. School District's Br. at 37. The School District further asserts that "there is no evidence that the manner in which [] Owner's expert calculated the loaded tax rate is the 'generally accepted' method of doing so. The trial court appropriately explained its decision to adopt the approach testified to by the [School] District's expert." School District's Br. at 39-40.

The School District criticizes Owner's contention that the trial court failed to consider Mr. Goodman's testimony, noting that the argument is meritless and that Owner cannot "complain that the trail [sic] court did not assign the weight to Mr. Goodman's general testimony that [Owner] wanted." School District's Br. at 40.

The School District further takes issue with Owner's contention that the trial court incorrectly determined that the effect of higher taxes need not be considered in the valuation process. The School District argues that this misstates the trial court's decision and that the trial court, in fact, did take into account the impact of higher taxes by adopting a vacancy and credit loss rate of 7.5%, even though it was not disputed that the Subject Property has never had a vacancy rate of more than 5%. The School District adds that "[i]t is difficult to image [sic] how the

18

Owner can complain that the trial court adopted the vacancy and credit loss number used by its own expert." School District's Br. at 41-42.

The School District argues that the trial court's findings are each supported by substantial evidence, and the trial court has exclusive province over all matters of credibility and evidentiary weight. School District's Br. at 40 (citing *RAS Dev. Corp. v. Fayette Cnty. Bd. of Assessment Appeals*, 704 A.2d 1130, 1137 (Pa. Cmwlth. 1997)). Thus, the School District contends that this Court should "affirm the decision of the trial court in all respects." School District's Br. at 42.

## IV. Discussion

### A. Motion to Dismiss and *Valley Forge*

We first address Owner's contentions that the trial court erred by requiring it to litigate its motion to dismiss at the time of trial and that the trial court effectively denied it an opportunity to conduct discovery. In these regards, we see no error. The February 15, 2018 order of the trial court allowed for withdrawal of the tax assessment appeals for tax years 2011-2017, and also ordered that Owner's motion to dismiss for tax year 2018 was withdrawn but that the issues raised therein were preserved and could be raised at any time prior to, or at, trial. S.R.R. at 9b. The order further stated:

> 3.     On or before thirty (30) days from the date of this [o]rder, the School District shall forward to [Owner] copies of all tax assessment appeals filed after July 1, 2017 and the result of each such appeal, including but not limited to any and all settlement agreements . . . .
> . . .
> 5.     The parties shall thereafter engage in settlement discussions for a period not to exceed thirty (30) days from the exchange of appraisals. Thereafter, the matter shall be listed for trial upon the filing of a trial praecipe by any party . . . .

19

6. The parties may, by written stipulation, extend the dates in this [o]rder. In the event that any issues arise attendant to this [o]rder, including but not limited to the failure to respond to discovery requests, the parties shall immediately contact this [c]ourt and a conference shall be timely scheduled to address and resolve said matters.

S.R.R. at 9b-10b.

The foregoing evinces reasonable flexibility and fairness by the trial court in regard to the procedure to be followed in the litigation and its timing, as well as in the provision and exchange of information between the parties. Further, Owner did not raise a contention to these points in its Pa. R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal. Thus, we reject Owner's assertion that the trial court improperly required it to litigate its motion to dismiss at the time of trial and denied it an opportunity to conduct discovery. In addition, the following exchange from the trial court transcript reveals that Owner did not raise any of these same concerns at trial, when it had a meaningful opportunity to do so:

> The Court: So we have a couple of motions to dispose of. We have [Owner's] motion to dismiss, which we discussed in the pretrial conference we'll handle the *Valley Forge* issue in the course of the hearing today. So that motion will be denied without prejudice.
> And we have [Owner's] motion in limine, which looks to me like there's not a real issue here?
>
> Mr. Stein[7]: Yes, Your Honor. I think based on the representations made in the [S]chool [D]istrict's response, I will just withdraw that motion.
>
> The Court: All right. Fine. Then the motion will be marked withdrawn. Thank you.

R.R. at 145a.

Further, the trial transcript reads:

---

[7] Mr. Stein is legal counsel for Owner.

> The Court: I had viewed the *Valley Forge* issue as in the nature of an affirmative defense, but if there are brief witnesses who don't have to sit here all day, that's fine with me. Mr. Stein, Mr. Onorato, what's your preference?
>
> Mr. Stein: I'm fine with that, Your Honor.

R.R. at 146a.

It does not appear from the record that Owner had concerns about its ability to conduct discovery or otherwise proceed at trial. Further, by failing to raise these issues at the trial court level, we consider them waived by Owner for our purposes here. Accordingly, we reject Owner's contention that the trial court erred in these regards.

We next address Owner's contention that the School District's appeals for tax years 2018-2020 should not have been permitted to proceed to trial after the appeal for tax years 2011-2017 was withdrawn. Concisely put, we concur with the School District's position that this argument is waived because Owner did not appear to object to same at the trial court level, and further, "[i]n cases where an appeal is pending before a trial court . . . subsequent tax assessments are automatically appealed, have a separate status, and continue to exist notwithstanding dismissal of the original assessment appeal." School District's Br. at 33 (citing *525 Lancaster Ave Apts*, 111 A.3d at 1231). For this same reason, we reject Owner's contention that the School District's position here is somehow undermined because its appeals policy was not developed until 2017 - after our Supreme Court issued its opinion in *Valley Forge*, even though the initial assessment appeal was initiated years before the adoption of the policy.

Further, we reject Owner's contention that the trial court erred by determining the School District's monetary threshold approach to tax assessment

appeals was implemented in a nondiscriminatory manner and was consistent with our Supreme Court's decision in *Valley Forge*. Although *Valley Forge* established that the Uniformity Clause does not permit a school district to selectively appeal assessments of commercial properties while choosing to forego appeal assessments of other types of properties, such as single-family residential homes, it also clearly enunciated the caveat that a monetary threshold or other criterion would not violate the Uniformity Clause, so long as it is implemented without regard to the type of property in question or the residency status of the property's owner. The School District here established a policy of proceeding on assessment appeals only where such an appeal would yield an annual tax increase of $10,000 or more. This was based on a business decision that the cost of pursuing an appeal would not make it worth it to the School District if the tax yield would be any lower. Although it is likely, in most cases, that such a threshold will include more commercial than residential properties, such a result is not a certainty, and Owner did not establish otherwise or demonstrate that the School District's policy was violative of the standard set forth in *Valley Forge*.

This Court subsequently opined on monetary thresholds and uniformity in tax assessment appeals in *Kennett Consolidated*, a case in which a school district set its policy of pursuing tax assessment appeals only in instances where a property was underassessed by at least $1 million.[8] In *Kennett Consolidated*, we stated:

> The [d]istrict's actions did not systematically target commercial properties, but, rather, only focused on properties that would be worth the cost and expense of an appeal. *Valley Forge* makes it abundantly clear that there is a balance to be struck between a school district's ability to appeal an assessment and the Uniformity Clause. Thus, a

---

[8] We note here that our Supreme Court granted *allocator* in *Kennett Consolidated*. *See* 240 A.3d 611 (Pa. 2020).

> school district's policy that attempts to be fiscally responsible by only appealing assessments that would generate enough revenue to justify the cost of the appeal does not violate the Uniformity Clause.

*Id.* at 37.

In *Kennett Consolidated*, we relied in part on our opinion in *Punxsutawney Area School District v. Broadwing Timber, LLC* (Pa. Cmwlth., No. 1209 C.D. 2018, filed October 29, 2019) 2019 WL 5561413, in which we determined that

> the [d]istrict's practice thus far has resulted in appeals of commercial or commercially[ ]used properties [but] is not determinative where that practice is implemented or carried out without regard to the type or ownership of a property. The [d]istrict relies on the occurrence of a triggering event to bring a potentially underassessed property to its attention. So far, no sale of residential properties has resulted in a high enough realty transfer tax to warrant review, and [taxpayer/property owner] has not presented evidence to the contrary. That is not to say that none will in the future, and . . . if one does, the same process will be used to determine whether that property's assessment should be appealed.

*Kennett Consolidated,* 228 A.3d at 39 *(*quoting *Punxsutawney*, slip op. at 21-22).

*Kennett Consolidated* and *Punxsutawney* are instructive in the present matter in that, here too, the School District set a monetary threshold for initiating its tax assessment appeals, and thus far, the appeals have implicated properties that are not obviously purely residential in character. However, as we noted in both *Kennett Consolidated* and *Punxsutawney*, this alone does not demonstrate a violation of the Uniformity Clause, per our Supreme Court's holding in *Valley Forge*. Further, as we stated in *East Stroudsburg*, "a taxing district's selection of a property for an assessment appeal that fail[s] to take into account whether the appeal [is] likely to be cost-effective might well be fiscally irresponsible." *East Stroudsburg*, slip op. at 11, 2019 WL 5250831 at *5.

23

Read together, our Supreme Court's opinion in *Valley Forge*, and our subsequent case law, establish that the trial court did not err by determining the School District did not violate the Uniformity Clause of the Pennsylvania Constitution.

## B. Valuation

Finally, we address Owner's contention that the trial court erred in its determination of the value of the Subject Property.[9] We disagree. The trial court considered the testimony of the appraisers, as well as the testimony of Mr. Goodman, which it specifically addressed, notwithstanding Owner's contention to the contrary, and adequately explained its evaluation of all the testimony and its reasons for reaching its conclusions. This Court does not make its own credibility determinations or second guess the trial court in this regard. We also do not re-weigh the evidence. The trial court is the finder of fact.

The trial court considered the testimony and other relevant evidence of a highly technical nature, from credentialed experts, and explained, in sufficient detail, the reasons why it made the determinations it did. Where the trial court had any remaining uncertainty after hearing the opinions of the two appraisers, it typically gave Owner the benefit of the doubt by accepting its appraiser's view over that of the School District's appraiser, reasoning, fairly, that the School District carried the burden of proof. It is important to remember that "[t]he valuation of property is not an exact science . . . it is the fact[-]finder's role to determine the

_____

[9] We note here that we reject the School District's assertion that Owner waived the argument that the trial court erred by applying valuation judgments without evidentiary support because Owner failed to include the issue in its Concise Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b). As Owners' Concise Statement is focused substantially on the methodology for valuation of the Subject Property and includes a specific contention that Mr. Goodman's testimony was disregarded by the trial court, we read it to include this issue.

24

weight to be accorded an expert's testimony in this area." *Cedarbrook Realty, Inc.*, 611 A.2d at 340. "[I]t is well[]established that the trial judge is the fact-finder in a tax assessment appeal and that all matters of credibility and evidentiary weight are in the province of the fact-finder." *Appeal of Mellon Bank*, *N.A.*, 467 A.2d 1201, 1202-03 (Pa. Cmwlth. 1983) (internal citation omitted). As we opined in *Willow Valley*:

> The trial court's duty in an assessment appeal is to weigh the conflicting expert testimony and determine a value based upon credibility determinations. The trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property. In tax assessment appeals, actual value or fair market value is determined by competent witnesses testifying as to the property's worth in the market; *i.e.*, the price a willing buyer would pay a willing seller, considering the uses to which the property is adapted and might reasonably be adapted. Our review in a tax assessment appeal is narrow such that the trial court's valuation will be affirmed unless its findings are not supported by substantial evidence or it abused its discretion or committed an error of law. The trial court's findings are entitled to great deference, and its decision will not be disturbed absent clear error.

*Willow Valley*, 810 A.2d at 723-24 (internal citations omitted).

In the present matter, there was nothing irregular or lacking in the trial court's methodology or the manner it went about reaching its conclusions on valuation. Its findings were based on substantial evidence, and there was no "clear error." *Id*. at 724. Thus, we see no basis upon which we would disturb the trial court's determination of the value of the Subject Property.

25

## V. Conclusion

For the foregoing reasons, we determine that the trial court did not err. Accordingly, we affirm the orders of the trial court.

_____
J. ANDREW CROMPTON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| School District of Upper Dublin | : | |
| | : | |
| v. | : | No. 1520 C.D. 2019 |
| | : | |
| Montgomery County Board of | : | |
| Assessment Appeals, Montgomery | : | |
| County, Upper Dublin Township, | : | |
| School District of Upper Dublin | : | |
| | : | |
| Appeal of: General Auto Outlet | : | |

# **O R D E R**

    **AND NOW**, this 16th day of July 2021, the October 1, 2019 Order of the Montgomery County Court of Common Pleas is **AFFIRMED**.

_____
J. ANDREW CROMPTON, Judge